**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 3:26-CR-7 (OAW) |
| | ) | |
| JASON GIBSON, | ) | |
| *Defendant*. | ) | |
| | ) | |

**RESTITUTION ORDER**

**THIS ACTION** is before the court on the government's motion for a restitution order ("Motion"). ECF No. 46. The court has reviewed the Motion and all exhibits thereto and is thoroughly advised in the premises.

## I. BACKGROUND

On January 13, 2026, pursuant to a plea agreement with the government, Mr. Gibson entered a guilty plea to possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). ECF No. 26. He was sentenced on July 8, 2026, to imprisonment for 120 months with 20 years of supervised release to follow. At sentencing, the court indicated that restitution, which is mandatory for this crime, would be ordered in the amounts requested by each victim. This order memorializes that ruling in greater detail.

## II. LEGAL STANDARD

Relevant statutory authority is clear that restitution must be ordered in cases such as this to repay "the full amount of the victim's losses that were incurred or are reasonably

1

projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim." 18 U.S.C.A. § 2259(b)(2)(A). Such losses include costs already or reasonably likely to be incurred as a proximate result of the offense of conviction, such as physical and mental healthcare, rehabilitative costs, living expenses, lost income, attorneys' fees, and "any other relevant losses incurred by the victim." *Id*. § 2259(c)(2). However, it is equally clear that an individual convicted of trafficking in child pornography should be ordered to pay only "an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses . . . ." *Id.* § 2259(b)(2)(B).

Even the Supreme Court of the United States has acknowledged, though, that fashioning a restitution order which satisfies all aspects of the statute is particularly difficult given the "atypical causal process underlying the losses" of a trafficking victim. *Paroline v. United States*, 572 U.S. 434, 449 (2014). While declining to devise a bright-line rule to govern such determinations, the Court listed a number of factors to consider: "the continuing traffic in the victim's images[;] . . . the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role." *Id.* at 460. This is not, however, "a precise mathematical inquiry," but rather an exercise of the court's discretion. *Id.* at 459. Notably, "Congress

2

substantially amended § 2259 in response to the *Paroline* decision." *United States v. Clemens*, 990 F.3d 1127, 1129 (8th Cir. 2021). Of particular importance, the statute now requires courts to impose restitution of at least $3,000 to each identified victim.

### III.    <u>DISCUSSION</u>

The court starts, per *Paroline*, with the individual survivors' gross economic losses, which itself presents a significant hurdle. Disaggregating the harm caused by the initial abuse from the harm caused by subsequent trafficking in child sex abuse material ("CSAM") is difficult if not impossible. First, one must acknowledge that viewing such content creates the demand for its continued production, thus incentivizing predators to perpetuate abuse. However, with no clear indication that any of these victims' abuse was caused by this defendant's viewership, the court will not further consider this point.

Instead, the court focuses on the new harm that trafficking itself inflicts. As noted even in *Paroline*, the victim there appeared to make something of a recovery from the initial abuse she suffered, only to be dealt a horrific setback when she realized that her trauma was being replayed by countless, faceless, nameless individuals for their sick personal enjoyment. As a result, the trafficking itself also inflicts a discrete and independent harm, which illustrates that a victim's wounds never are allowed to fully heal, and that rehabilitation and treatment likely will have to continue throughout a victim's entire life, and throughout their unfathomable, ongoing suffering.

The impact statements provided by the identified survivors in this case consistently describe the depression, anxiety, and post-traumatic stress disorder directly attributable to the *trafficking* of abusive content in which they are depicted. Several letters describe

some measure of recovery, which disappears when upon the realization that they can never forget the horrors of their abuse. The survivors commonly lament that these anonymous, depraved individuals who recreationally consume child abuse could be anyone they see on any given day. They fear that someone could recognize them, and they have difficulty trusting others, for good reason. Several survivors have received anonymous and inappropriate communications, including links to their own abuse. Others have been stalked, and their legal names and home addresses have been circulated amongst CSAM "enthusiasts."

To combat the impacts of trafficking, survivors must invest in security systems, engage services to protect their identities, and seek medical treatment targeting the effects that the knowledge of trafficking has had on their personal health.

Therefore, the court easily accepts as reasonable the calculations provided by several survivors estimating their *disaggregated* losses, while those calculations yield sums in the millions of dollars.

Turning to the *Paroline* factors, useful though it might be to know the degree of continuing traffic in any individual's images, it is a hallmark of CSAM that its distribution is not easily monitored, so figuring that number is impossible. It certainly is reasonable to take as given, though, that technology will continue to advance in ways that make faster and farther distribution easier, such that the number of future offenders will increase. Several survivors speak to the endless barrage of notices they receive each time they are identified in a new prosecution. Some even have engaged attorneys to receive these notices on their behalf, because their mere receipt is counterproductive to recovery.

It is not clear in this case how many convictions have resulted in restitution orders to these victims. But those survivors who unfortunately have over a decade of such orders report having recovered only about half of their total losses (which seems entirely plausible, given the court's own comments at sentencing regarding the common rate of restitution collection in federal court), and one can expect those losses to increase as trafficking expands exponentially and as technology continues to advance. Even those who, like Mr. Gibson, do not create or redistribute this material, create a market for this content by seeking out and consuming it. They create the supply by demanding it.

At sentencing, Mr. Gibson asked the court to order restitution of $3,000 per victim, which is the statutory minimum, citing Mr. Gibson's lack of assets. The government asked only that the court order at least that amount per victim, identifying many factors which may be relevant to this issue (such as the relative harm each victim has suffered) but ultimately disclaiming any idea how to apply them. It is the law, though, that a defendant's ability to pay is not a factor appropriately considered when imposing restitution. And the court declines to pit the victims against each other or to somehow rank their suffering in determining their losses. What a particular victim requires to be made whole is a highly individualized inquiry, and therefore the court finds any comparison between victims to be irrelevant. Instead, the court finds it appropriate first to review the asserted losses of each individual to determine whether the total amount is supported by the record, and then to determine whether the amount each individual requests is a reasonably fair demand of a single defendant convicted of trafficking in the images of their abuse. Here the court concludes that each survivor has shown their losses to be substantial and

supported by expert reports.  Further, the court finds that the amount they each request from this defendant reflects his relative responsibility for their ongoing trauma.[1]

"Angela" requests $10,000 in restitution from Mr. Gibson.  She was only five years old when her abuse was recorded. She reports never feeling safe, even in her own home. She eloquently describes her struggle to not only survive day-to-day, but to thrive, pointing out that the horror is not over for her.  This amount is less than one percent of her well-supported total losses.  The court finds this to justify the restitution she requests.

"April" requests $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She was only five years old when her abuse was recorded.  She has asked to stop receiving direct notice of trafficking prosecutions because the sheer number of cases causes her severe distress.  Mr. Gibson possessed 360 images of her abuse, which justifies the amount she requests.

"Henley" requests $5,000 in restitution.  She could have pursued modeling, which may have been lucrative, but the continued trafficking in images of her abuse made her decline the offer.  Employment and education have been difficult due to video technology now commonplace in those settings, as video technology itself is a trigger for her.  She has diverted receipt of the notices of new prosecutions involving the images of her abuse because of their deleterious effect upon her mental health.  In fact, she might choose not to receive notice at all, except that by doing so she would be ineligible for restitution, which she needs to address the costs of her ongoing trauma.  She continues to be recognized and approached by individuals who make comments which trigger a new wave of trauma response.  The court finds this to justify the restitution she requests.

---

[1] The court suggests no brightline rule for this determination, nor does such a rule need to be contemplated here, where no victim requests more than one percent of their estimated total losses.

"Ashley" seeks $3,000 in restitution from Mr. Gibson.  This being the statutory minimum, the court finds this amount appropriate.

"Fiona" requests $10,000 in restitution.  Fiona was only six when her abuse began, meaning she, too, faces an entire life without any period of remembered normalcy despite having little conscious memory of the actual abuse.  She also was sedated for some of the recorded abuse, which makes the viewing of this content even more depraved and invasive.  The court finds this to justify the restitution she requests.

"Audrey" seeks $5,000 in restitution from Mr. Gibson.  This represents less than one percent of her likely total losses.  She is still quite young, but she already understands that her images will live on the Internet forever.  She appears to cope with that knowledge by recognizing that as new criminals are found with her images, they will be removed from society and unable to hurt anyone else, though she no longer speaks of a desire to become a nurse (which was a source of manipulation during her abuse).  Having to bear her trauma for the rest of her life certainly justifies the amount she requests.

"Jane" requests $10,000 in restitution.  This represents less than half of one percent of her well-supported total losses.  She was drugged by her abuser, which might otherwise have prevented her from having clear memories of the abuse, but for the continued trafficking in its content.  She expresses fear of professional success, because she believes it might lead to discovery of her victimization, and that deplorable people might recognize and find her.  The court finds this to justify the restitution she requests.

"Sierra" seeks $5,000 in restitution from Mr. Gibson.  This is less than one percent of her anticipated medical expenses alone; she does not even attempt to calculate

anticipated lost earnings during her lifetime.  The court finds this to be a justified request given that her total losses are likely to be much greater than is currently known.

"Sally" seeks $8,000 in restitution from Mr. Gibson.  She was only two years old when her abuse began, and her abuse included forced interactions with her own siblings. Content of her victimization is particularly depraved, which justifies the amount she seeks.

"Lily" seeks $10,000 in restitution from Mr. Gibson.  Despite her abuse having occurred two decades ago, individuals such as Mr. Gibson continue to traffic in images of it, rendering her harm particularly long-lived.  And although individuals have been prosecuted for possessing such content for many years, she still has only recovered a little more than half her total losses.  This amount also is less than half of one percent of her well-supported total losses.  The court finds this to justify the restitution she requests.

"Jenny" asks for $10,000 in restitution, which is less than one percent of the conservative estimate of her total losses.  She has dealt with the trafficking in her images for approximately ten years, and she has received notice of hundreds of cases involving images of her abuse, which has caused ongoing trauma for her.  Despite having had traffickers of her images prosecuted for some time, very few of her losses have been repaid to date.  The court finds this to justify the restitution she requests.

"Aster" asks for $10,000 in restitution.  Mr. Gibson possessed over 200 images of her abuse.   The court finds this to justify the restitution they request.

"Maureen" seeks $10,000 in restitution.  Images of her abuse have been trafficked for over a decade, which continues to retraumatize her. She still struggles to sleep, cites the high cost of medical treatment she will require for the rest of her life, and desires to pursue education, as her trauma prevented her completion of high school.  She is unable

to maintain employment due to crippling anxiety, and has been found by those who traffic in images of her abuse through reverse image searches. Her request is justified.

"Sarah" asks for $10,000 in restitution. This represents less than half of one percent of her well-supported total losses. She has received notice of thousands of cases of trafficking in images of her abuse. The sheer volume of trafficking has led her to move from her state to a remote location in order to insulate herself from anyone who may have seen her abuse. Mr. Gibson himself personally possessed 332 images of Sarah's abuse. The court finds this to justify the restitution she requests.

"Anna" asks for $3,000 in restitution (the statutory minimum), despite the horrors of her abuse. The court finds her request unquestionably reasonable.

"Cara" asks for $8,000 in restitution. She was visibly drugged during her recorded abuse, making viewing such content particularly depraved. She might not have become aware of the extent of her abuse but for the continued trafficking in its images. The trafficking is her first exposure to some of her abuse, which justifies the amount she seeks.

"Erika" seeks $10,000 in restitution from Mr. Gibson. She is overwhelmed by the recognition that new abusers are accessing the images of her abuse each day, and the trafficking in those images actually makes it harder for her to cope with the original abuse. Her sister, who also was abused, died a traumatic death in part due to her own inability to cope with the ongoing trafficking of CSAM depicting her. Erika found her and attempted to resuscitate her without success. Even at her sister's funeral, measures had to be taken to prevent sick viewers from attending. In these ways, Erika's recovery has been further impaired by the harm inflicted by trafficking itself. The court finds these struggles to justify the amount Erika requests.

"Alex" seeks $5,000 in restitution.  Her continued exploitation causes her acute paranoia, to the point that she barricades doors in her home and avoids going out.  She has severe mental illness which prevents her from working.  The trafficking in content depicting her abuse has left her with a perverse aversion to success in the creative arts she enjoys for fear of being recognized.  These struggles will have significant financial impacts on her for the rest of her life, which the court finds to justify the amount she seeks.

"Taylor" asks for the statutory minimum of $3,000 in restitution, which the court finds completely reasonable.

"Heather" seeks $5,000 in restitution from Mr. Gibson.  CSAM depicting her image has only recently been identified and so she has not yet been able to calculate her complete total losses.  But she has several severe psychological disorders as a result of her abuse and the continued trafficking in content that depicts her abuse, to the point that she has required intensive in-patient treatment. The facilities that provide such treatment cost more than a thousand dollars per day.  Given that survivors of childhood abuse generally expect to require hundreds of thousands of dollars in therapy alone, the court finds it reasonably shown that her therapeutic treatment likely will be even higher.  Her anxiety is so severe that she cannot attend school.  The degree of her psychological distress justifies the amount she requests.

"SV" seeks $9,000 in restitution from Mr. Gibson.  The costs of the extensive therapy SV requires (and ancillary expenses, such as transportation to therapy) have been prohibitive for her and her adoptive mother, such that she does not always receive necessary treatment.  And she will always require these extensive services since the images of her abuse will always be available on the Internet.  The restitution sought is

less than one percent of the anticipated total expenses her continuing abuse will cost her in her lifetime.  Therefore, the court finds her request to be appropriate and reasonable.

"Jessy" asks for $5,000 in restitution.  He is still too young to comprehend the full extent of the distribution of the images of his abuse.  His ongoing healthcare needs have presented a significant financial burden for him and his family, and will continue to do so as he becomes aware of the sheer scope of CSAM trafficking.  The court finds this is a reasonable amount to request in light of those financial needs.

"Pia" asks for $7,500 in restitution (less than one percent of her well-supported total losses).  Her abuse occurred when she was four and five years old, and traffickers in its content prevent her from forgetting it.  The restitution she requests is justified.

"Sloane" seeks $10,000 in restitution, which is less than half of one percent of her well-supported total losses.  Trafficking in content of her abuse resulted in her legal name and recent photographs being revealed online.  Employment has been difficult due to challenges using the Internet (given her abuse), which justifies the restitution requested.

## IV.   <u>CONCLUSION</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Mr. Gibson hereby is ordered to pay a total of $181,500 in restitution to the victims so far identified, in the amounts each individual requests.

   i. The payments shall be made in accordance with statute, which normally requires an immediate lump-sum payment.  However, the court already having found that Mr. Gibson is indigent at this time,

11

repayment shall be made a condition of his supervised release. Accordingly, interest shall accrue in accordance with statute.

ii. Defendant shall make payment to the Clerk of Court. Payment may be made in cash, check or money order. All payments by check or money order shall be made payable to the "Clerk, United States District Court," and each check shall be delivered to "United States District Court, Attention: Clerk's Office, 141 Church Street, New Haven, CT 06510," as required by 18 U.S.C. § 3611. Defendant shall write the docket number of this case on each check delivered to the Clerk's Office. Any cash payments shall be hand delivered to the Clerk's Office using exact change, and shall not be mailed. Payments can be made through Pay.gov, using a checking or savings account (ACH) or credit, debit, and prepaid cards. Instructions on how to self-enroll and make payments online are on the court's website at: http://www.ctd.uscourts.gov/payment-information.

iii. The Clerk shall distribute restitution payments to the victim(s) identified in this order in accordance with the District's Standing Order on the Disbursement of Restitution Payments by the Clerk of Court.

iv. The government is instructed to file a chart under seal which indicates the appropriate means of delivering any restitution payments to the victims.

2. Defendant shall notify the court, the United States Probation Office (during any period of supervised release), and the United States Attorney's Office, of any material change in Defendant's economic circumstances which might affect his ability to pay restitution in accordance with 18 U.S.C. § 3664(k).

3. Defendant shall notify the United States Probation Office (during any period supervised release) and the United States Attorney's Office of any change in address.

4. Defendant shall apply to any restitution still owed the value of any substantial resources from any source the defendant receives during the period of incarceration, including inheritance, settlement, or other judgment in accordance with 18 U.S.C. § 3664(n).

5. Nothing in this order shall prevent the Bureau of Prisons from collecting restitution payments in accordance with its Inmate Financial Responsibility Program ("IFRP"), 28 C.F.R. § 545.10 et seq., up to the maximum amount permitted under the IFRP guidelines.

6. The court also hereby enters a no-contact order which prohibits Mr. Gibson from ever knowingly seeking, contacting, or attempting to contact, directly or indirectly, any of the individuals depicted in the videos and images seized during this investigation.

14

**IT IS SO ORDERED** at Hartford, Connecticut, this 8th day of July, 2026.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE
